IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

OHIO VALLEY ENVIRONMENTAL
COALITION, INC., WEST VIRGINIA
HIGHLANDS CONSERVANCY, INC.,
and, SIERRA CLUB,

           Plaintiffs,

v.                                            CIVIL ACTION NO. 2:13-20571

ALEX ENERGY, INC.,

           Defendant.

**MEMORANDUM OPINION AND ORDER**

Pending before the Court are Defendant's Motion for Summary Judgment (ECF No. 33) and Plaintiffs' Motion for Partial Summary Judgment (ECF No. 35). For the reasons explained below, Defendant's Motion is **DENIED** and Plaintiffs' Motion is **GRANTED**. The Court **FINDS** that Defendant is liable under all three Counts of Plaintiffs' Complaint.

**I.    Background**

Plaintiffs Ohio Valley Environmental Coalition, Inc. ("OVEC"), West Virginia Highlands Conservancy, Inc., and Sierra Club filed this case pursuant to the citizen suit provisions of the Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. § 1251 et seq., and the Surface Mining Control and Reclamation Act ("SMCRA"), 30 U.S.C. § 1201 et seq. According to the Complaint, Defendant Alex Energy, Inc., holds WV/NPDES Permit WV1021907, which regulates certain mining activities, including operation of PGM Surface Mine No. 1 in Nicholas County, West Virginia. Compl. ¶ 10, ECF No. 1. The

same WV/NPDES Permit also regulates Outfall 029, which is part of Defendant's Hardway Branch Surface Mine. Def.'s Resp. Opp'n Pls.' Mot. Partial Summ. J. at 6, ECF No. 38; WV/NPDES Permit WV1021907, ECF No. 35-2. Outfall 029 discharges into Hardway Branch of Twentymile Creek of the Gauley River. Compl. ¶ 39. WV/NPDES Permit WV1021907 does not explicitly, on its face, impose selenium limitations, but it does incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states in part that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]." Plaintiffs allege that Defendant's discharges from Outfall 029 contain excessive amounts of selenium and therefore violate the CWA and the SMCRA. Specifically, Count One alleges violation of the CWA, Count Two alleges violation of the SMCRA's performance standards regarding water quality, and Count Three alleges violation of the SMCRA's requirement that adequate treatment facilities be installed.

Defendant moves for summary judgment on Plaintiffs' claims. ECF No. 33; *see also* Def.'s Mem. Supp. Mot. Summ J., ECF No. 34. Plaintiffs filed a Response in opposition, ECF No. 39, and Defendant filed a Reply, ECF No. 41. Plaintiffs move for partial summary judgment on the issue of liability as to their three claims for relief. ECF No. 35; *see also* Pls.' Mem. Supp. Mot. Partial Summ. J., ECF No. 36. Defendant filed a Response in opposition, ECF No. 38, and Plaintiffs filed a Reply, ECF No. 40. Both motions are now ripe for resolution.

Section II presents the legal standard applicable to motions for summary judgment. Section III examines the regulatory framework underlying Plaintiffs' citizen suit. Section IV briefly discusses Defendant's Motion for Summary Judgment. Lastly, Section V examines Plaintiffs' Motion for Partial Summary Judgment.

## II. Legal Standard

To obtain summary judgment, the moving party must show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In considering a motion for summary judgment, the Court will not "weigh the evidence and determine the truth of the matter." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Instead, the Court will draw any permissible inference from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986).

Although the Court will view all underlying facts and inferences in the light most favorable to the nonmoving party, the nonmoving party nonetheless must offer some "concrete evidence from which a reasonable juror could return a verdict in his favor." *Anderson*, 477 U.S. at 256. Summary judgment is appropriate when the nonmoving party has the burden of proof on an essential element of his or her case and does not make, after adequate time for discovery, a showing sufficient to establish that element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The nonmoving party must satisfy this burden of proof by offering more than a mere "scintilla of evidence" in support of his position. *Anderson*, 477 U.S. at 252.

"'[W]here the moving party has the burden—the plaintiff on a claim for relief or the defendant on an affirmative defense—his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party.'" *Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 822 (D. Md. 1998) (quoting *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986)). "Thus, if the movant bears the burden of proof on an issue, . . . he must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986).

Having discussed the standard for review of motions for summary judgment, the Court now turns to the regulatory framework underlying this lawsuit.

### III. Regulatory Framework

One primary goal of the CWA is "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). To further this goal, the CWA prohibits the "discharge of any pollutant by any person" unless a statutory exception applies; the primary exception is the procurement of a National Pollutant Discharge Elimination System ("NPDES") permit. 33 U.S.C. §§ 1311(a), 1342. Under the NPDES, the U.S. Environmental Protection Agency ("EPA") or an authorized state agency can issue a permit for the discharge of any pollutant, provided that the discharge complies with the conditions of the CWA. 33 U.S.C. § 1342. A state may receive approval to administer a state-run NPDES program pursuant to 33 U.S.C. § 1342(b). West Virginia received such approval of its state-run NPDES program in 1982. 47 Fed. Reg. 22363-01 (May 24, 1982). The State's NPDES program is currently administered by the West Virginia Department of Environmental Protection ("WVDEP").

All West Virginia NPDES permits incorporate by reference West Virginia Code of State Rules § 47-30-5.1.f, which states in part that "discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by [West Virginia Code of State Rules § 47-2]."[1] States are required by the CWA to adopt water

---

[1] Section 47-30-5.1.f states in its entirety: "The discharge or discharges covered by a WV/NPDES permit are to be of such quality so as not to cause violation of applicable water quality standards promulgated by 47 C.S.R. 2. Further, any activities covered under a WV/NPDES permit shall not lead to pollution of the groundwater of the State as a result of the disposal or discharge of such wastes covered herein. However, as provided by subdivision 3.4.a. of this rule, except for any toxic effluent standards and prohibitions imposed under CWA Section 307 for toxic pollutants injurious to human health, compliance with a permit during its term constitutes compliance for purposes of enforcement with CWA Sections 301, 302, 306, 307, 318, 403, and 405 and Article 11."

quality standards in order to "protect the public health or welfare[ and] enhance the quality of water," and such water quality standards "shall be established taking into consideration their use and value for public water supplies, propagation of fish and wildlife, recreational purposes, and agricultural, industrial, and other purposes, and also taking into consideration their use and value for navigation." 33 U.S.C. § 1313(c)(2)(A). Each standard "shall consist of the designated uses of the navigable waters involved and the water quality criteria for such waters based upon such uses." *Id.*

West Virginia's water quality standards promulgated for the protection of aquatic life impose limitations on selenium. Specifically, selenium cannot exceed an acute limitation of 20 ug/l or a chronic limitation of 5 ug/l. W. Va. Code R. § 47-2, app. E, tbl.1, div. 8.27. The acute limitation is defined as a "[o]ne hour average concentration not to be exceeded more than once every three years on the average." *Id.* § 47-2-9 n.1. The chronic limitation is a "[f]our-day average concentration not to be exceeded more than once every three years on the average." *Id.* n.2.

In *OVEC v. Fola Coal Company, LLC*, this Court was asked to determine whether holders of WV/NPDES permits that incorporate § 47-30-5.1.f by reference are required to comply with the selenium limitations found in West Virginia's water quality standards. No. 2:12-cv-3750, 2013 WL 6709957, at *10-21 (S.D. W. Va. Dec. 19, 2013). The Court examined two permits held by Fola, neither of which identified selenium as a pollutant whose presence must be monitored or limited. Both permits, however, incorporated by reference the WV/NPDES Rules for Coal Mining and Facilities found in Title 47, Series 30, of the West Virginia Code, including § 47-30-5.1.f. This incorporation by reference was in accordance with state rules, which require that the water quality standards rule of § 47-30-5.1.f—among other rules—"be incorporated into

the WV/NPDES permits either expressly or by reference." W. Va. Code R. § 47-30-5; *Fola*, 2013 WL 6709957, at *2. Relying in part on this Court's earlier decision in *OVEC v. Marfork Coal Company, Inc.*, No. 5:12-cv-1464, 2013 WL 4506175 (S.D. W. Va. Aug. 22, 2013), this Court held that § 47-30-5.1.f was an explicit and enforceable condition of Fola's WV/NPDES permits and that Fola would not be protected by the permit shield defense[2] if it violated this permit condition. *Fola*, 2013 WL 6709957, at *10-21; s*ee also OVEC v. Consol of Kentucky, Inc.*, No. 2:13-cv-5005, 2014 WL 1761938, at *3 (S.D. W. Va. Apr. 30, 2014) (discussing this finding from *Fola*); *OVEC v. Alex Energy, Inc.*, No. 2:12-cv-3412, 2014 WL 1329919, at *4 (S.D. W. Va. Mar. 31, 2014) (same); *OVEC v. Elk Run Coal Company, Inc.*, No. 3:12-cv-0785, 2014 WL 29562, at *3-10 (S.D. W. Va. Jan. 3, 2014) (in finding that the defendants were not protected by the permit shield, relying in part on this Court's discussion of § 47-30-5.1.f in *Marfork* and *Fola*).

In addition to being subject to the CWA, coal mines are also subject to regulation under the SMCRA, which prohibits any person from engaging in or carrying out surface coal mining operations without first obtaining a permit from the Office of Surface Mining Reclamation and Enforcement ("OSMRE") or an authorized state agency. 30 U.S.C. §§ 1211, 1256, 1257. A state may receive approval to administer a state-run surface mining permit program pursuant to 30 U.S.C. § 1253. West Virginia received conditional approval of its state-run program in 1981. 46 Fed. Reg. 5915-01 (Jan. 21, 1981). West Virginia's surface mining permit program is administered by the WVDEP pursuant to the West Virginia Surface Coal Mining and Reclamation Act ("WVSCMRA"). W. Va. Code § 22-3-1 et seq. Regulations passed pursuant to the WVSCMRA require permit holders to comply with the terms and conditions of their permits

---

[2] Under the permit shield defense, a permit holder cannot be held liable for CWA violations if the permit holder is in compliance with the terms of its permit. *See* 33 U.S.C. § 1342(k).

and all applicable performance standards. W. Va. Code R. § 38-2-3.33.c. One of these performance standards requires that "[d]ischarge from areas disturbed by surface mining shall not violate effluent limitations or cause a violation of applicable water quality standards." *Id.* § 38-2-14.5.b. Another performance standard mandates that "[a]dequate facilities shall be installed, operated and maintained using the best technology currently available . . . to treat any water discharged from the permit area so that it complies with the requirements of subdivision 14.5.b of this subsection." *Id.* § 38-2-14.5.c.

### IV. Defendant's Motion for Summary Judgment

Defendant requests that the Court grant summary judgment in its favor as to all of Plaintiffs' claims, arguing that Defendant is shielded from liability because it is not required to comply with water quality standards, and therefore, its discharges comply with all permit terms. Defendant's arguments mirror those raised—and rejected—previously by this Court in its *Marfork* line of cases. Defendant does not offer new argument on these previously-resolved issues that alters the Court's analysis. Therefore, the Court will not revisit its earlier findings about the applicability of § 47-30-5.1.f and the permit shield. Defendant's arguments for summary judgment in its favor are rejected.

### V. Plaintiffs' Motion for Partial Summary Judgment

Having determined that Defendant's arguments regarding the permit shield and the effect of § 47-30-5.1.f do not bar the instant lawsuit, the Court next examines Plaintiffs' arguments as to why partial summary judgment should be granted in their favor.

#### A. Standing

In order to bring any action in federal court, a plaintiff must have standing—that is, a plaintiff must have a sufficient personal stake in the outcome of the matter being litigated to

make it justiciable under Article III of the Constitution. *See Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper I*"), 204 F.3d 149, 153 (4th Cir. 2000); *see also* U.S. Const. art. III (restricting federal courts to adjudicating "cases" and "controversies"). In order to satisfy the minimum constitutional requirements for standing, an individual plaintiff must demonstrate:

> (1) [he] has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). In environmental cases, "a plaintiff need only show that he used the affected area, and that he is an individual 'for whom the aesthetic and recreational values of the area [are] lessened' by the defendant's activity." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty., MD*, 268 F.3d 255, 263 (4th Cir. 2001) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735 (1972)). Furthermore, "[t]he relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." *Laidlaw*, 528 U.S. at 181.

As this Court explained in *OVEC v. Maple Coal Company*, a court is not required to determine the merits of the environmental violations alleged when deciding if standing exists. 808 F. Supp. 2d at 882 (citing *Laidlaw*, 528 U.S. at 181). "What [standing] does require is a demonstration that if the allegations of Clean Water Act violations are true, the impacts of the alleged violations are felt in an area with which the plaintiffs have 'a direct nexus.'" *Id.* (citing *Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.* ("*Gaston Copper II*"), 629 F.3d 387, 395 (4th Cir. 2011)). A plaintiff "may rely on circumstantial evidence such as proximity to polluting sources, predictions of discharge influence, and past pollution to prove both injury in

fact and traceability." *Gaston Copper I*, 204 F.3d at 163. To require more would contravene the otherwise "straightforward Clean Water Act issue of whether [the defendant] has violated its permit limitations," thereby "throw[ing] federal legislative efforts to control water pollution into a time warp by judicially reinstating the previous statutory regime in the form of escalated standing requirements." *Id.* at 163-64.

When the plaintiff in question is an organization, that organization "has standing to sue on behalf of its members when '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'" *Am. Canoe Ass'n, Inc. v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003) (quoting *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).

Plaintiffs assert standing through Cindy Rank and James Tawney. *See* Cindy Rank Decl., ECF No. 35-7; Cindy Rank Dep., ECF No. 35-9; James Tawney Decl., ECF No. 35-8; James Tawney Dep., ECF No. 35-10. Ms. Rank is a member of all three plaintiff organizations. Rank Decl. ¶¶ 2, 5, 7. She states that she has "a long term connection to Twentymile Creek," starting with her first visit around 1994 as part of an interagency mine tour. *Id.* ¶¶ 10, 11. She has visited Twentymile Creek at least once a year for the past five years, enjoying the sights of birds and animals. *Id.* ¶ 21. She most recently visited the creek in August 2013 and states that she will "continue to visit the Gauley River watershed, Twentymile Creek in particular, and other tributaries in the area approximately once per year." *Id.* ¶¶ 24, 30. Ms. Rank thinks about the effects of upstream mining on the area and states that her "enjoyment of Twentymile Creek would greatly improve if mining companies[,] including Alex Energy[,] were forced to clean up the pollution and comply with their permits." *Id.* ¶¶ 15, 20, 21, 26. When asked during her

deposition about Defendant's alleged noncompliance with its permits, she specifically noted that, based on evidence collected, "there was obviously a problem with selenium that had developed" because of Defendant's mining activities. Rank Dep. at 11. Her deposition overall shows her significant concern about selenium-laden discharges. For example, her "preference would be to have no selenium because [she] think[s] that zero discharge is a good idea and should be achieved." *Id.* at 13. Plaintiffs have sufficiently alleged standing through Ms. Rank.

Mr. Tawney is also a member of all three plaintiff organizations. Tawney Decl. ¶¶ 1, 2. Mr. Tawney notes the "large complex of mines straddling the Twentymile Creek watersheds," stating that he "know[s] that there are selenium problems with many of the mines in this area and [that he is] concerned about the impacts to water quality." *Id.* ¶ 7; *see also id.* ¶ 8 ("I worry a lot about the discharge of toxic selenium from minesites."). Mr. Tawney has visited Twentymile Creek since he was a child, fishing and swimming in the area. *Id.* ¶ 10. As an adult, he has continued to visit Twentymile Creek for recreational enjoyment, visiting two or three times a year—and sometimes much more often—during approximately the past six years. *Id.* ¶¶ 13, 16, 20. He does not swim in the creek anymore because of pollution, and he is concerned about the effects of pollution on local fish populations. *Id.* ¶¶ 22, 33, 34. He visited Twentymile Creek as recently as August 2013 and intends to visit two or three times a year for the foreseeable future. *Id.* ¶¶ 34, 37. Plaintiffs have sufficiently alleged standing through Mr. Tawney.

Defendant has not challenged Plaintiffs' allegations regarding standing. In summary, Plaintiffs have sufficiently alleged standing to pursue the instant action based on the activities of their members, Cindy Rank and James Tawney.

**B. Sixty Days' Notice**

Under the CWA and the SMCRA, no citizen suit may be commenced prior to the provision of sixty days' notice to the alleged violator, the Administrator of the EPA (for CWA citizen suits) or the Secretary of the Department of the Interior (for SMCRA citizen suits), and the State in which the alleged violation occurs. 30 U.S.C. § 1270(b)(1)(A); 33 U.S.C. § 1365(b)(1)(A). Plaintiffs sent a letter to the appropriate recipients which appears to provide the necessary details for valid notice of suit on December 21, 2012. *See* Notice Intent, ECF No. 35-11. This lawsuit was commenced over sixty days later, on July 16, 2013. Defendant has not challenged Plaintiffs' provision of sixty days' notice. The Court finds that the sixty days' notice requirement is met.[3]

### C. Good-Faith Allegation of Continuous or Intermittent Violation

As explained above, Plaintiffs bring their claims under the citizen suit provisions of the CWA and the SMCRA. The CWA's citizen suit provision states,

> [A]ny citizen may commence a civil action on his own behalf . . . (1) against any person . . . who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation . . . .

33 U.S.C. § 1365(a). The SMCRA's citizen suit provision states,

> [A]ny person having an interest which is or may be adversely affected may commence a civil action on his own behalf to compel compliance with this chapter . . . against any other person who is alleged to be in violation of any rule, regulation, order or permit issued pursuant to this subchapter . . . .

30 U.S.C. § 1270(a). The Supreme Court has interpreted the phrase "alleged to be in violation"—which appears in both the CWA and the SMCRA provisions above—to require "that citizen-plaintiffs allege a state of either continuous or intermittent violation—that is, a reasonable

---

[3] Later in this Memorandum Opinion and Order, the Court briefly revisits the issue of the sufficiency of this letter, during its discussion of Defendant's arguments regarding the sufficiency of Plaintiffs' SMCRA claims.

likelihood that a past polluter will continue to pollute in the future." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.* ("*Gwaltney III*"), 484 U.S. 49, 57 (1987).[4]

"[A] good-faith allegation [of continuous or intermittent violation] . . . suffice[s] for jurisdictional purposes . . . ." *Id.* at 65. The issue of what evidence must be shown for jurisdictional purposes is distinct from what evidence must be shown for a defendant to ultimately be held liable for violations of the CWA and the SMCRA. *See Chesapeake Bay Found., Inc. v. Gwaltney of Smithfield, Ltd.* ("*Gwaltney IV*"), 844 F.2d 170, 171 (4th Cir. 1988) (on remand from the Supreme Court, drawing a distinction between "a good faith allegation of ongoing violation sufficient to maintain jurisdiction" and "prov[ing] [an] allegation of continuous or intermittent violations, as required in order to prevail"). The Supreme Court specifically rejected the proposition that "citizen-plaintiffs must prove their allegations of ongoing noncompliance before jurisdiction attaches." *Gwaltney III*, 484 U.S. at 64. Good-faith allegations, not definitive proof, suffice for jurisdictional purposes. *Id.* at 65. To meet the jurisdictional requirements, Plaintiffs must merely show that, at the time they filed suit, they had a good-faith belief that Defendant was in continuous or intermittent violation of the CWA and the SMCRA. In a jurisdictional sense, then, this good-faith belief is an element of each of Plaintiffs' claims.

---

[4] The *Gwaltney* line of cases is highly instructive for the Court's deliberations here. For the purposes of this case, it is useful for the Court to refer to several of the cases in this line: 1) the district court's original decision, 611 F. Supp. 1542 (E.D. Va. 1985) ("*Gwaltney I*"); 2) the Fourth Circuit's affirmance of this decision, 791 F.2d 304 (4th Cir. 1986) ("*Gwaltney II*"); 3) the Supreme Court's decision on appeal from the Fourth Circuit, 484 U.S. 49 (1987) ("*Gwaltney III*"); and 4) the Fourth Circuit's decision on remand from the Supreme Court, 844 F.2d 170 (4th Cir. 1988) ("*Gwaltney IV*").

Accordingly, the Court must consider what constitutes a sufficient good-faith belief for jurisdictional purposes. In the district court case which eventually gave rise to the Supreme Court's *Gwaltney III* decision, the Eastern District of Virginia considered this question:

> A useful analogy [for understanding good-faith belief] is the manner in which the federal courts treat the jurisdictional amount requirement in diversity cases. . . .
>
> In diversity cases, the question whether the jurisdictional amount is satisfied—and whether the court, ultimately, has jurisdiction—is not answered by whether the plaintiff ultimately recovers in excess of $10,000. Rather, the issue is whether the amount plaintiff *stated in the original claim* satisfies the amount, and is made in good faith. . . . [T]he test of good faith is whether it appears to be a "legal certainty" that the jurisdictional fact is not satisfied.

*Chesapeake Bay Found. v. Gwaltney of Smithfield, Ltd.* ("*Gwaltney I*"), 611 F. Supp. 1542, 1549 n.8 (E.D. Va. 1985) (citations omitted), *aff'd*, 791 F.2d 304 (4th Cir. 1986) ("*Gwaltney II*"), *vacated on different grounds in Gwaltney III,* 484 U.S. 49. In *Gwantley I*, the district court found that "there was no certainty . . . —legal, factual, or otherwise—that [the defendant's] system would correct one of the two major violation problems for which this suit was brought—until nearly one year after the suit was filed." *Id*. In view of that finding, that district court ruled that the *Gwantley I* plaintiffs had sufficiently pled a violation in good faith.

Plaintiffs' Complaint notes sampling conducted by Defendant on November 8, 2011, which allegedly showed that the discharge from Outfall 029 had a selenium concentration of 6.71 ug/l. Compl. at 9, 10. Plaintiffs clarify on summary judgment that this measurement, taken from a lab sheet attached to Defendant's permit application, is incorrect, and that the measurement from that day was actually 5.7 ug/l. *See* Pls.'s Mem. Supp. Mot. Partial Summ. J. at 5 n.2. Plaintiffs' Complaint also provides a table of seven selenium measurements, taken from April 2007 to June 2012 and ranging from 4.5 ug/l to as high as 12 ug/l. Compl. at 10. Plaintiffs argue that the six of these measurements which are above 5 ug/l "exceeded the magnitude of the

chronic selenium water quality standard." Pls.'s Mem. Supp. Mot. Partial Summ. J. at 4-5. However, there is no indication that these measurements reflect a four-day average, and therefore, they cannot be considered chronic measurements. Neither do any of the measurements exceed the acute selenium limitation of 20 ug/l. Plaintiffs also point to the "the absence of any evidence of any meaningful efforts by [Defendant] to eradicate the cause of the excessive selenium." Compl. at 11. Additionally, Plaintiffs' notice letter requested that Defendant inform them if Defendant had taken steps to stop the pollution alleged or if the letter was inaccurate, Notice Intent at 5, and Defendant apparently never responded to this request.

This Court has previously held that these same Plaintiffs presented a sufficient good-faith allegation of continuous or intermittent violation of the water quality standards where— "[a]lthough the pre-Complaint evidence presented may not show conclusively either chronic or acute violations"—Plaintiffs presented a list of "consistent measurements above 5 ug/l, and as high as 13.60 ug/l." *Consol*, 2014 WL 1761938, *17. The number of pre-Complaint measurements presented here is quite low and the most recent measurement was taken a little more than one year before the Complaint was filed. Nonetheless, these measurements, coupled with the lack of proof of any efforts by Defendant as of the time of filing to abate the alleged pollution, are sufficient to form a good-faith allegation of continuous or intermittent violation.

### D. Liability

The Court next considers whether Defendant is liable for violating West Virginia's water quality standards. CWA liability can be established in two ways:

> Citizen-plaintiffs may [prove an ongoing violation] either (1) by proving violations that continue on or after the date the complaint is filed, or (2) by adducing evidence from which a reasonable trier of fact could find a continuing likelihood of a recurrence in intermittent or sporadic violations. Intermittent or sporadic violations do not cease to be ongoing until the date when there is no real likelihood of repetition.

*Gwaltney IV,* 844 F.2d at 171-72; *see also Alex Energy*, 2014 WL 1329919, at *14; *Fola*, 2013 WL 6709957, at *24. Plaintiffs are not required to establish pre-Complaint violations in order to prevail, and neither are Plaintiffs required to prove the pre-Complaint violations alleged as a basis for jurisdiction in the Complaint. *Alex Energy*, 2014 WL 1329919, at *14; *Fola*, 2013 WL 6709957, at *24-25.

To support their claim that Defendant is in continuing violation of the CWA, Plaintiffs point to the results of sampling conducted in January and February 2014 pursuant to Federal Rule of Civil Procedure 34. On Plaintiffs' behalf, samples were collected by Downstream Strategies at Outfall 029 and from Hardway Branch immediately downstream of Outfall 029 daily from January 27, 2014, to February 1, 2014, resulting in three chronic selenium concentration measurements for each sampling point. These six chronic measurements ranged from 7.675 to 8.250 ug/l, each exceeding the chronic selenium limitation of 5 ug/l. ECF No. 35-6 (table presenting sampling results). Defendant also collected samples from these locations on each of these days, resulting in six chronic selenium concentration measurements that ranged from 6.600 to 7.100 ug/l, each of which exceeds the chronic selenium limitation. *Id.* Defendant does not dispute the results of this sampling. Based on this evidence, Plaintiffs present post-Complaint evidence sufficient to establish at least one violation of West Virginia's water quality standards. Plaintiffs have established Defendant's liability under Count One of the Complaint.

### E. Dispute Regarding Plaintiffs' SMCRA Claims

Defendant argues that Plaintiffs should not be awarded summary judgment in their favor on the SMCRA claims—Counts Two and Three—because Plaintiffs do not cite the correct surface mining permit in the Complaint and their Motion for Partial Summary Judgment. Plaintiffs' Complaint alleges violations of Surface Mining Permit S301405, which is held by

Defendant. Compl. ¶¶ 10, 36, 39, 41, 44, 46-48. Surface Mining Permit S301405 regulates Defendant's PGM No. 1 Surface Mine. *Id.* ¶ 10. As discussed earlier, Outfall 029 is not located on PGM No. 1 Surface Mine, but instead on Defendant's Hardway Branch Surface Mine. Hardway Branch Surface Mine is regulated by its own surface mining permit—Surface Mining Permit S300199. According to Defendant,

> Valley Fill No. 3, the valley fill above Outlet 029, is part of the Hardway Branch Surface Mine ([Surface Mining] Permit No. S-3001-99), but is also overbonded on the PGM No. 1 Surface Mine (S-3014-05); however, no spoil from the PGM No. 1 operation (S-3014-05) has ever been placed in Valley Fill No. 3.

Def.'s Resp. Opp'n Pls.' Mot. Partial Summ. J. at 6. Because of this situation—where Valley Fill No. 3 is not impacted by mining related to Surface Mining Permit S301405—"the conditions of Permit No. S-3014-05 are not implicated by any drainage." *Id.* Therefore, according to Defendant, summary judgment on Plaintiffs' SMCRA claims should be denied. *Id.*

Plaintiffs argue that even if this factual premise is true, they are nonetheless entitled to summary judgment on their SMCRA claims. First, they argue that Defendant's discharges from Outfall 029 violate SMCRA performance standards applicable to all surface mining operations and those "performance standards are independently enforceable under the SCMRA [sic] citizen suit provision, regardless of their incorporation into a permit." Pls.' Reply Supp. Mot. Partial Summ. J. at 4, ECF No. 40. According to Plaintiffs, they "primarily allege violations of the performance standards in the SMCRA and WVSCMRA regulations" but secondarily allege violations of Surface Mining Permit S301405. *Id.* at 3; *see also* Compl. at 14 ("Defendant has committed one or more violations of the performance standards incorporated in the regulations under SMCRA and the WVSCMRA" and "[b]ecause those performance standards are permit conditions, Defendant is *also* in violation of the terms and conditions of WVSCMRA Permit S301405." (emphasis added)).

Second, Plaintiffs argue that Defendant is indeed violating Surface Mining Permit S301405. They point out that the WVDEP's own online permit database lists Mining Permit S301405—not S300199—as the only "related permit" for WV/NPDES Permit WV1021907. ECF No. 40-1 (print-out from the WVDEP website, dated May 23, 2014). This listing suggests that Mining Permit S301405 is indeed associated with discharges otherwise covered by WV/NPDES Permit WV1021907. Outfall 029, however, is unusual in that it is not a part of the mine that comprises the bulk of WV/NPDES Permit WV1021907; rather, the Permit was amended to include Outfall 029. *See* WV/NPDES Permit WV1021907 at 1 (letter of addendum to permit). Plaintiffs also point out that:

> Defendant admits that Valley Fill No. 3 is within the bonded area of Mining Permit S301405. Valley Fill No. 3, therefore, is an area disturbed by surface mining on Mining Permit S301405. The fact that Outlet 029 is not located within the bonded area of Mining Permit S301405, does not mean that Outlet 029's flow is not "discharge from areas disturbed by surface mining" on Mining Permit S301405. Defendant's continuing violations of the chronic selenium water quality standard in Hardway Branch demonstrate that Defendant is violating Mining Permit S301405.

Pls.'s Reply at 6.

The Court finds that Defendant's problematic discharges are covered by Surface Mining Permit S301405. Valley Fill No. 3 is covered by that Permit because it is within that Permit's "bonded" area. Because it appears, based on the descriptions provided by the parties, that Valley Fill No. 3 empties directly into Outfall 029, the water flowing from Outfall 029 would indeed constitute discharge from an area disturbed by surface mining covered by that mining Permit, even though Outfall 029 itself is not covered by that Permit. No evidence has been presented which suggests that Outfall 029's discharges are not impacted by Valley Fill No. 3 or that the sampling results do not reflect the impact of mining within or upon Valley Fill No. 3. Therefore,

Plaintiffs have established that Defendant is in violation of Surface Mining Permit S301405 and have therefore proven that Defendant is liable under Counts Two and Three of the Complaint.[5]

## VI.    Conclusion

For the reasons explained above, Defendant's Motion for Summary Judgment is **DENIED** and Plaintiffs' Motion for Partial Summary Judgment is **GRANTED**. The Court **FINDS** that Defendant is liable under all three Counts of Plaintiffs' Complaint.

The Court **DIRECTS** the Clerk to send a copy of this written Opinion and Order to counsel of record and any unrepresented parties.

ENTER:    July 22, 2014

ROBERT C. CHAMBERS, CHIEF JUDGE

---

[5] The Court notes, as an alternative basis for its holding, that Plaintiffs' notice letter substantially complies with applicable requirements. Although the notice letter discusses Surface Mining Permit S301405 and no other surface mining permit, the letter specifically names Outfall 029, making it clear to which location Plaintiffs are referring. *See Comfort Lake Ass'n, Inc. v. Dresel Contracting, Inc.*, 138 F.3d 351, 355 (8th Cir. 1998) ("A citizen suit is limited to violations that are closely related to and of the same type as the violations specified in the notice of intent to sue."). Additionally, even if the Complaint were insufficient, the Court would grant leave to amend so that the correct mining permit could be named, as Surface Mining Permit S300199 is not meaningfully different from S301405. The Court also points out that Defendant did not raise the issue of naming the correct permit until its Response, rather than in its own Motion for Summary Judgment or even earlier when it received the notice letter. Having made these findings, the Court need not reach Plaintiffs' argument about the independent enforceability of performance standards.